No. 14-15000

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

In re:  APPLE IPHONE ANTITRUST LITIGATION,

ROBERT PEPPER; STEPHEN H. SCHWARTZ;
EDWARD W. HAYTER; ERIC TERRELL,
*Plaintiffs – Appellants,*
v.
APPLE INC.,
*Defendant – Appellee.*

---

On Appeal From The United States District Court
For The Northern District of California
The Honorable Yvonne Gonzalez Rogers
No. C 11-06714-YGR

---

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

---

Francis M. Gregorek (SBN# 144785)
Rachele R. Rickert (SBN# 190634)
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA  92101
Telephone:  619/239-4599
Facsimile:  619/234-4599

Mark C. Rifkin
Alexander H. Schmidt
Michael Liskow (SBN# 243899)
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Telephone:  212/545-4600
Facsimile:  212/545-4677

*Counsel for Plaintiffs-Appellants Robert Pepper, Stephen H. Schwartz,*
*Edward W. Hayter, and Eric Terrell*

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION.................................................................................................1

ARGUMENT......................................................................................................6

I.     Apple's Rule 12(g) Argument Fails.................................................6

II.    Plaintiffs Are Direct Purchasers .....................................................9

III.   The SAC States A Claim ..............................................................16

      A.    Plaintiffs Adequately Allege Aftermarket Monopolization...............16

      B.    Plaintiffs Adequately Allege Anticompetitive Conduct....................23

IV.   Plaintiffs Are Entitled To Replead..................................................27

CONCLUSION.................................................................................................28

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page(s)**

*Allen v. Ornoski,*
   435 F.3d 946 (9th Cir. 2006) ............................................................... 28

*Allied Orthopedic Appliances, Inc. v. Tyco Health Care Group, LP,*
   592 F.3d 991 (9th Cir. 2010) ................................................... 24, 25, 26

*In re Apple & AT&TM Antitrust Litigation,*
   596 F. Supp. 2d 1288 (N.D. Cal. 2008) ........................... 18, 19, 20, 23

*In re Apple iPhone Antitrust Litigation,*
   874 F. Supp. 2d 889 (N.D. Cal. 2012) .................................................. 3

*In re ATM Fee Antitrust Litigation,*
   769 F. Supp. 2d 984 (N.D. Cal. 2009) ................................................ 13

*In re ATM Fee Antitrust Litigation,*
   No. C 04-02676 CRB,
   2010 U.S. Dist. LEXIS 97009 (N.D. Cal. Sept. 16, 2010) .................... 7

*In re ATM Fee Antitrust Litigation,*
   686 F.3d 741 (9th Cir. 2012) ...................................................... *passim*

*Campos v. Ticketmaster,*
   140 F.3d 1166 (8th Cir. 1998) (Arnold, J., dissenting) ...................... 15

*Delaware Valley Surgical Supply, Inc. v. Johnson,*
   523 F.3d 1116 (9th Cir. 2008) ........................................................ 3, 11

*Digital Equipment Corp. v. Uniq Digital Technologies, Inc.,*
   73 F.3d 756 (7th Cir. 1996) ................................................................ 21

*Doe v. United States (In re Doe),*
   58 F.3d 494 (9th Cir. 1995) ............................................................... 27

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
   504 U.S. 451 (1992) ...................................................................*passim*

*Free Freehand Corp. v. Adobe Systems, Inc.,*
   852 F. Supp. 2d 1171 (N.D. Cal. 2012) ............................................24

*Image Technical Services, Inc. v. Eastman Kodak Co.,*
   125 F.3d 1195 (9th Cir. 1997) ....................................... 23, 24, 25, 26

*Lefkowitz v. McGraw-Hill Global Education Holdings, LLC,*
   13 Civ. 5023 (KPF),
   2014 U.S. Dist. 75649 (S.D.N.Y. June 2, 2014) ..................................6

*Mercoid Corp. v. Mid-Continent Investment Co.,*
   320 U.S. 661 (1944) ........................................................................25

*Murphy v. DirecTV, Inc.,*
   724 F.3d 1218 (9th Cir. 2013) ...........................................................3

*Negron v. School District of Philadelphia,*
   Civ. Action No. 13-CV-00169,
   2014 U.S. Dist. LEXIS 4947 (E.D. Pa. Jan. 14, 2014) ........................6

*Newcal Industries, Inc. v. IKON Office Solution,*
   513 F.3d 1038 (9th Cir. 2008) ...................................................*passim*

*OSU Student Alliance v. Ray,*
   699 F.3d 1053 (9th Cir. 2012) .........................................................27

*PSI Repair Services, Inc. v. Honeywell, Inc.,*
   104 F.3d 811 (6th Cir. 1997) ...........................................................21

*United States v. Microsoft Corp.,*
   253 F.3d 34 (D.C. Cir. 2001) ...........................................................26

*Watison v. Carter,*
   668 F.3d 1108 (9th Cir. 2012) .........................................................27

## **<u>STATUTES & RULES</u>**

Federal Rules of Civil Procedure
  12..........................................................................................................6
  12(b) ...............................................................................................6, 8
  12(b)(1)..............................................................................................8
  12(b)(6)................................................................................7, 16, 23
  12(c) ................................................................................................6, 7
  12(g) ...........................................................................................6, 7, 9

## INTRODUCTION

Apple's arguments in its opposition brief ("Def. Br.") lack merit. Apple does not dispute the pertinent facts, and its explicit and tacit concessions ultimately disprove each of Apple's legal arguments. Apple does not deny any of the facts alleged in Plaintiffs' complaint (the "SAC") that make Plaintiffs direct purchasers of apps under the law of this Circuit. Apple does not dispute that:

- Apple owns and operates the App Store.

- App developers place their apps for sale on the App Store's virtual shelves pursuant to mandatory exclusive distribution contracts with Apple.

- Apple transacts all App Store sales to consumers, Plaintiffs bought the apps directly from the App Store, and paid Apple's alleged supracompetitive 30% fee directly to Apple, the alleged monopolist.

Apple also does not deny that Plaintiffs *would be* direct purchasers if Apple operated the App Store on a traditional wholesale-retail model, *i.e.*, if Apple bought apps from the developers and re-sold them to Plaintiffs after adding its 30% fee. Thus, Apple's entire standing argument boils down to the proposition that Plaintiffs are somehow transformed into indirect purchasers simply because Apple uses a consignment model instead of a wholesale-retail model. Unsurprisingly,

Apple cites no authority for this proposition, and it cannot be that Apple can skirt the antitrust laws by this simple machination.

Apple invokes a transparently mistaken argument to deny that Plaintiffs are direct purchasers. *First*, Apple ignores the facts alleged in the SAC and relies instead upon its own version of events, as it did in the lower court. Indeed, Apple does not even attempt to refute Plaintiffs' argument that the lower court misapplied the *Twombly* pleading standards by accepting Apple's mischaracterization of the facts. This alone is grounds for reversal. *See* Plaintiffs' Opening Brief ("Pl. Br.") at 29-32.

Apple's entire argument rests on its assertion that the challenged 30% fee is a "fee for distribution services" that Apple imposes on developers, not a separate charge imposed on consumers. Def. Br. at 1-2, 17, 28, 35-36, 41. But Plaintiffs *allege the exact opposite*: the SAC alleges that the developers pay "an annual fee of $99" for the right of "distribution through Apple's App Store," and that the 30% fee is a separate fee that is paid by App Store consumers and "constitutes virtually pure profit for Apple" because "[e]ach developer's $99 annual fee covers most or all of Apple's costs of reviewing that developer's apps and the related proportional costs of operating and maintaining the App Store." EOR 070, ¶¶ 38-41; EOR 072, ¶ 48. These factual allegations, which the Court must accept as true for purposes of Apple's motion to dismiss, squarely refute Apple's assertion that the 30%

- 2 -

consumer surcharge was a distribution fee – distribution was what developers paid Apple $99 for each year.[1] Since Apple's factual predicate fails, so does the rest of its argument.

*Second*, jumping off its flawed factual premise, Apple errantly argues that the Court's decision in *In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012), controls this case. As previously shown, it does not. *See* Pl. Br. at 40-42.[2]

*Third*, rather than focusing on the transaction "that ultimately effectuated the transfer of" the apps, as required by this Court's "bright line" direct purchaser rule, *see Del. Valley Surgical Supply, Inc. v. Johnson & Johnson*, 523 F.3d 1116, 1120-21 (9th Cir. 2008), Apple improperly inspects the economics of its "special business arrangements" with the app developers, *id.* at 1124, to try to justify its

---

[1] These allegations also put the lie to Apple's statements that it "bear[s] the cost of reviewing, hosting and distributing [free] Apps to consumers" and that "Plaintiffs think that Apple … should not charge developers anything for the opportunity to sell Apps through the App Store." Def. Br. at 7, 19.

[2] Apple's repeated assertion that Plaintiffs seek to "circumvent" Judge Ware's decision compelling arbitration against Apple in *iPhone I*, Def. Br. at 7-8, 9, 10, 11, 16, 22, is not relevant to any issue on appeal and is baseless in any event. Apple acknowledges that it cannot rely on the arbitration clause in AT&T Mobility's wireless services agreement with respect to Plaintiffs' apps claims. Earlier in this case, moreover, Judge Ware ruled that Apple would not be able to rely on AT&T's arbitration clause even as to the voice and data claims because those claims are not "'the same' as the claims that were subjected to arbitration in" *iPhone I. In re Apple iPhone Antitrust Litig.*, 874 F. Supp. 2d 889, 898 (N.D. Cal. 2012). It is now settled in this Circuit that a non-signatory like Apple can no longer rely on equitable estoppel principles to compel arbitration under another defendant's arbitration clause in a case like this one. *See Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1228-32 (9th Cir. 2013).

- 3 -

argument that the developers rather than consumers paid the 30% fee to Apple. But Apple cannot rest on its own characterization of how the fee was paid while ignoring that Plaintiffs have plausibly alleged that the transaction "that ultimately effectuated the transfer" of the monopoly-priced apps occurred when Plaintiffs bought them directly from the monopolist Apple, in its App Store.

Under *Illinois Brick*, the analysis begins and ends with those basic facts. Everything else is superfluous and irrelevant, including the purpose for the 30% fee or how it is labeled. Even if the 30% fee had been for "distribution services," Plaintiffs still bought the product laden with that fee directly from Apple, the alleged monopolist, and for that reason they are direct purchasers under the law. If the app developers were the alleged monopolists, then Plaintiffs would be indirect purchasers without standing to sue because Apple would be a middleman retailer separating Plaintiffs from the developers in the vertical supply chain. Because the middleman Apple is the alleged monopolist here, Plaintiffs are direct purchasers from Apple with standing to sue Apple. Under *Illinois Brick*, the standing analysis is just that simple.

Apple's tacit concessions also defeat its argument that Plaintiffs have failed to state an aftermarket monopolization claim. Apple does not dispute that:

- Apple is the sole worldwide distributor of iPhone apps because Apple requires all app developers to sell all their apps exclusively in the App Store.

- Through its App Store, Apple controls 100% of the aftermarket for iPhone apps.

- Apple does not disclose to its iPhone customers at the point of sale that (i) it has a monopoly over app sales or (ii) customers will pay supracompetitive prices for apps.

These well-pled facts, together with Plaintiffs' allegation that they did not "knowingly consent" to Apple's aftermarket monopoly, state a claim that Apple unlawfully has locked its iPhone customers into its apps aftermarket monopoly in violation of this Court's decision in *Newcal Indus., Inc. v. IKON Office Solution*, 513 F.3d 1038 (9th Cir. 2008).

Apple's argument that Plaintiffs have not stated a viable aftermarket claim amounts to an argument that *Newcal* was wrongly decided. As much as Apple would prefer otherwise, in *Newcal* this Court adopted a "knowing consent" standard, which puts the onus on Apple to disclose its aftermarket monopoly and supracompetitive prices to its customers. The Court did not adopt the "reasonable discoverability" standard that Apple advocates, which unfairly would place the burden on consumers to ferret out Apple's undisclosed monopoly and

supracompetitive pricing. *Newcal* should not be overruled to make it easier for defendants like Apple to lock their unwitting customers into monopolized aftermarkets where they are forced to pay supracompetitive prices.

Apple's argument that Plaintiffs have not pled "anticompetitive conduct" by Apple warrants little attention. Plaintiffs allege that Apple, which faces robust competition in the software aftermarkets for its iMac and MacBook computers, deliberately "closed" its iOS-based operating system for its mobile computer, the iPhone, and entered into exclusive contracts with every app developer to gain a monopoly over the iPhone apps aftermarket and thus extract supracompetitive profits. That conduct is illegal, even for inventors of new products like the iPhone.

Finally, this Court should apply Rule 12(g) and hold that the lower court improperly permitted Apple to make *four* Rule 12(b) motions.

## ARGUMENT

## I. APPLE'S RULE 12(g) ARGUMENT FAILS

Under Rule 12(g), the court below should not have granted Apple's indirect purchaser argument or entertained Apple's failure to state a claim argument given that Apple failed to make either of those arguments in two earlier Rule 12 motions in this case before Judge Ware. The plain terms of Rule 12(g) should be honored and applied by the district courts in this Circuit. If the drafters of the federal rules wanted to permit successive Rule 12(b) motions so long as they were not made "in

bad faith or for purposes of delay," Def. Br. at 21, they would have written the rules that way. They did not. *See Negron v. Sch. Dist. of Phila.*, Civ. Action No. 13-CV-00169, 2014 U.S. Dist. LEXIS 4947, at *8-9 (E.D. Pa. Jan. 14, 2014) (rejecting "judicial economy" exception as inconsistent with plain terms of Rule 12(g)).

Apple's argument that permitting successive Rule 12(b) motions avoids delay is a red herring. Instead of filing its third or fourth Rule 12(b) motions, Apple could have simultaneously answered the complaint and moved under Rule 12(c). *See Lefkowitz v. McGraw-Hill Global Educ. Holdings, LLC*, 13 Civ. 5023 (KPF), 2014 U.S. Dist. LEXIS 75649, at *11-12 (S.D.N.Y. June 2, 2014) (defendant could not file new Rule 12(b) motion but could file answer and Rule 12(c) motion). The only "delay" here was Apple's own delay in filing an answer, which is precisely what Rule 12(g) is designed to avoid.

Rule 12(g) should never be interpreted to permit the blatant judge-shopping Apple did here. Apple does not deny that it chose not to move under Rule 12(b)(6) while Judge Ware was presiding over this case because Judge Ware already had denied the exact same motion in *iPhone I*. Incredibly, Apple attempts to blame the Plaintiffs for its failure to comply with Rule 12(g) by suggesting that it failed to move under Rule 12(b)(6) in either of its first two Rule 12(b) motions because the complaints purportedly treated the apps claims as "an afterthought." Def. Br. at

21.   That argument is sheer nonsense.   As Apple concedes, Plaintiffs' original complaint in this case "was nearly identical to the *iPhone I* complaint." *Id*. at 10. Apple did not hesitate to move to dismiss the same apps claims in *iPhone I*.  Since Apple knew enough to move to dismiss the apps claims in the earlier case, it surely knew enough to make the same motion here.  Plainly, Apple chose not to do so because it believed Judge Ware again would sustain the claims.

Equally unavailing is Apple's contention that it was permitted to raise its Rule 12(b)(1) argument for the first time in its third Rule 12(b) motion because "the particular *Illinois Brick* and *ATM Fee* argument that Apple made … was not available to Apple at the time Apple filed its original motion to dismiss."  Def. Br. at 22.  *Illinois Brick* was more than 30 years old before Apple made its first motion to dismiss in this case, and the district court had already decided the *ATM Fee* case, which this Court later affirmed.  *In re ATM Fee Antitrust Litig*., No. C 04-02676-CRB, 2010 U.S. Dist. LEXIS 97009 (N.D. Cal. Sept. 16, 2010).  Moreover, Apple had already made the same Illinois Brick standing argument in opposition to class certification in *iPhone I* long before filing its first motion to dismiss in this case. *See* Pl. Br. at 48.

Putting aside that this Court's *ATM Fee* decision is a straightforward application of *Illinois Brick* that did not change the law in any respect, that decision did not justify Apple's violation of Rule 12(g).  Even if *ATM Fee* had

changed the law, there is no "new law" exception to Rule 12(g). A defense is "unavailable" under Rule 12(g) only if an amended complaint adds a new claim that the defendant could not have challenged in its initial motion to dismiss. *See* Pl. Br. at 26-27. That did not happen here. Rule 12(g), therefore, should be enforced against Apple.

## II.  PLAINTIFFS ARE DIRECT PURCHASERS

Plaintiffs are the direct – and only – purchasers of iPhone apps with antitrust standing under the facts of this case. As previously shown, this Court's bright line test for direct purchaser standing focuses exclusively on the allegedly tainted product's distribution chain and asks the simple question, "Did the Plaintiffs buy the alleged monopoly-priced product directly from the alleged monopolist?" The answer here is plainly and unavoidably "yes." Plaintiffs allege that they bought monopoly-priced apps directly from Apple through its App Store, the world's only retail outlet for iPhone apps. EOR 63-64, 67. Furthermore, Plaintiffs allege that they paid the 30% monopoly surcharge directly to Apple, the alleged monopolist that imposed the fee on them. EOR 70-71, 77-78. Those well-pleaded facts easily satisfy this Court's straightforward direct purchaser test, and certainly do so on a motion to dismiss. *See* Pl. Br. at 32-40.

Apple's entire argument that Plaintiffs are indirect purchasers rests on a wholly improper – and demonstrably false – re-casting of Plaintiffs' allegations.

Plaintiffs allege that Apple charges developers a $99 annual distribution fee, which the developers pay directly to Apple. EOR 70, 72. Plaintiffs also allege that Apple separately charges and collects directly from consumers the 30% monopoly surcharge on each app sale. EOR 70-71. Apple simply ignores these allegations and urges the Court to accept its contrary factual assertion that the 30% surcharge is a "distribution fee" paid by developers. Apple's argument violates the motion to dismiss standards, which require courts to accept Plaintiffs' factual allegations as true and draw all reasonable inferences in their favor. *See* Pl. Br. at 29.

Apple's approach also violates this Court's holding that direct purchaser status must be judged solely by looking at the transaction "that ultimately effectuated the transfer of" the monopoly-priced product. *Del. Valley Surgical*, 523 F.3d at 1120-21. Here, that transaction undisputedly was between Apple, which owned and operated the App Store, and Plaintiffs, who purchased apps from Apple in the App Store. Apple's argument that the app developers paid the 30% fee and "passed it on" to Plaintiffs does not remotely comport with the facts. The developers never paid anything to Apple except the $99 annual distribution fee. The entire 30% monopoly surcharge was paid to Apple by Plaintiffs at the point of sale when they purchased apps in the App Store.

Apple argues that developers "paid" the 30% fee when Apple deducted it before paying the balance of the sale proceeds to the developers. But Apple's act

- 10 -

of keeping 30% of Plaintiffs' payment was not a "payment by" the developers to Apple. Even if it could be construed that way, the 30% fee was still paid *first* by the Plaintiffs *directly to* Apple. The bright-line test of *Illinois Brick* avoids precisely the kind of convoluted tracing that Apple's argument invites.

Plaintiffs were the *only* purchasers of the monopoly-priced apps in the entire distribution chain, and they were the only (or at least the first) payers of the 30% fee to Apple. Either way, viewing the transaction that actually occurred, Plaintiffs are direct purchasers, regardless of whether the fee is labeled as a "distribution" fee, a marketing fee, or pure monopoly profit.

Recognizing that the facts do not favor it, Apple deems irrelevant the admitted fact that it "collects the entire purchase price from the consumer." Def. Br. at 17. Apple cites no authority, and its argument is contradicted by *Del. Valley Surgical*. Apple is merely seeking an excuse to look to what it contends are the underlying economics of app purchases rather to the transaction itself. The Court's decision in *Del. Valley Surgical* prohibits Apple's approach.

Even if the Court could look beyond the actual transaction, Apple's argument that the developers bore the 30% fee does not pass scrutiny as a matter of

economics because that fee was not an input cost to the developers. *See* Pl. Br. at 34-35 n.10. In any event, that issue is irrelevant to the direct purchaser analysis.[3]

Apple's oft-repeated argument, Def. Br. at 1, 12-13, 17, 27, that Plaintiffs did not specifically plead that they paid the 30% fee to Apple "on top of" the cost of the apps is another red herring. That, too, has nothing to do with whether Plaintiffs are direct purchasers, and Apple has cited no authority for the proposition that a plaintiff must use the phrase "on top of" to plead that a monopolist has charged a supracompetitive price. Plaintiffs have alleged that the 30% fee is a monopoly price by pleading that Plaintiffs would not have paid that fee in a competitive market. *See* Pl. Br. at 10-13.[4] The law requires nothing more in the complaint.

Apple's argument that Plaintiffs' allegations are "functionally identical to the allegations this Court considered in *ATM Fee*," Def. Br. at 25, rests entirely on its factually incorrect assertion that the app developers (rather than Plaintiffs) paid the 30% fee to Apple. The *ATM Fee* case involved classic indirect purchaser allegations. There the plaintiffs alleged that the defendant banks price-fixed one

---

[3] While the issue of whether the entire 30% fee was supracompetitive is relevant, that issue goes only to damages, which Apple has never contended were improperly pled. *See id.* at 44 n.11.

[4] The SAC, in fact, does specifically plead that Apple's 30% fee was in addition to the cost of the apps, which should have satisfied the lower court's *sua sponte* concern over whether Plaintiffs alleged a supracompetitive price. *See* Apple's "Supplemental Excerpts of Record" at SER 009-010.

fee, which the plaintiffs conceded they did *not* pay, and the enhanced price was

"passed on" by the banks through *another* fee, which the plaintiffs *did* pay.  Here,

by sharp contrast, Plaintiffs paid the monopoly fee directly to the alleged

monopolist when they purchased monopoly-priced apps directly from Apple.  Pl.

Br. at 40-42.  No matter how the fee is labeled, Plaintiffs are direct purchasers

under *ATM Fee*.[5]

Apple's misguided attempt to portray the App Store as "a shopping mall

leas[ing] physical space to various stores" is premised on the fallacy that this case

concerns Apple's sale of "software distribution services to developers" rather than

its sales of apps to consumers.  Def. Br. at 28.  Apple's analogy is inapt because

shopping mall operators do not sell anything to shoppers.  They lease space to

retail sellers, who sell goods to their customers.  Unlike shopping mall operators,

Apple does not lease App Store shelf space to developers.  And unlike shopping

mall retailers, developers do not sell apps to iPhone consumers.  Apple does.

The correct analogy, to which Apple offers no response, is that the App

Store functions like a virtual consignment store.  *See* Pl. Br. at 9.  Apple concedes

that Plaintiffs would be direct purchasers if Apple operated on a wholesale-retail

model, and there is no basis in the law, economic theory, antitrust policy, or logic

---

[5]  Apple's reliance on *ATM Fee* is also misplaced because it was a summary
judgment opinion.  The plaintiffs' direct purchaser allegations there withstood a
motion to dismiss.  *In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d 984, 1004
(N.D. Cal. 2009).

for transforming Plaintiffs into indirect purchasers simply because Apple uses a consignment model. *See id*. at 34-35. Apple does not even address, much less refute, this obvious conclusion.

As to whether the lower court errantly adopted the much-maligned *Campos v. Ticketmaster* "antecedent transaction" indirect purchaser analysis, it plainly did so at Apple's strenuous urging. *See* EOR 30 at n.10 (August 15, 2013 opinion noting Apple's reliance on *Campos*). *See also* Apple's briefs below, *iPhone II*, No. 4:11-cv-06714-YGR, Dkt. No. 88, at 9-10 (*Campos* is "on point" and "foreclose[s] Plaintiffs' claims here"); Dkt. No. 115, at 6-8 (multiple citations to *Campos*); Dkt. No. 118, at 4 n.2 ("Plaintiffs' effort to dismiss *Campos* … as bad out-of-circuit law is without merit" because both *Campos* and *In re ATM Fee* "follow the Supreme Court's teaching that the purpose of the *Illinois Brick* doctrine is to avoid having to consider how antecedent conspiracies or monopolies affect pricing to customers").

While Apple understandably walks away from *Campos* in this Court, there should be no mistake that Apple's emphatic equating of *Campos* and *ATM Fee* led the lower court into error. Although the court cited only *ATM Fee* and not *Campos*, its reasoning followed that of *Campos*: because Apple told developers in advance that Apple would charge a 30% fee on all App Store purchases, the lower court held that "agreement" meant that the developers bore the 30% fee, rendered the consumers indirect purchasers, and insulated Apple from liability to Plaintiffs.

EOR 012. This Court's decision in *ATM Fee* does not apply that type of an analysis, only *Campos* does.

Apple continues to make the same erroneous argument despite acknowledging that *Campos* is irrelevant: "Plaintiffs contend that the prices they paid for Apps were too high only because they were influenced by *antecedent transactions* between Apple and developers." Def. Br. at 33 (emphasis added). But the traditional rule is that an indirect purchaser is "someone in a vertical supply chain who purchases a monopolized product from someone other than a monopolist." *Campos*, 140 F.3d 1166, 1174 (8th Cir. 1988) (Arnold, J., dissenting). That is the controlling rule in this Circuit, *see In re ATM Fee*, 686 F.3d at 749-50, not the *Campos* majority's aberrant view. No matter how Apple tries to package the "antecedent transaction" argument, the Court should reject it.

Although Apple argues that Plaintiffs are seeking to forge a "new exception" to *Illinois Brick*, Def. Br. at 33, it is Apple that is trying to create new law. Retailer-consumer transactions are prototypical direct purchaser transactions under this Court's bright line test. Apple seeks an exemption for any retailer that happens to employ a consignment model rather than a wholesale-retail sales model. Just as courts are rightly reluctant to carve out new exceptions to the rule that indirect purchasers lack standing to sue, *see ATM Fee*, 686 F.3d at 749, 757 (citations omitted), courts should not create new exceptions to the bright-line rule

that direct purchasers do have antitrust standing. Apple should not be exempt from antitrust liability to App Store customers simply because Apple chose to run the App Store as a consignment store.

Applying this Court's bright line direct purchaser test to the facts alleged here could not be more straightforward. Because Apple is the alleged monopolist and Plaintiffs bought the alleged monopoly-priced apps directly from Apple, Plaintiffs are direct purchasers with standing to sue Apple.

## III. THE SAC STATES A CLAIM

Apple's various arguments that the SAC fails to state a claim, which the court below twice failed to reach,[6] do not accurately describe the law and, at best, raise factual questions that cannot be decided on a motion to dismiss.

### A. Plaintiffs Adequately Allege Aftermarket Monopolization

Apple wrongly contends that Plaintiffs have failed to state a claim for aftermarket monopolization under this Court's decision in *Newcal*. As shown below, the relevant inquiry on Apple's Rule 12(b)(6) motion challenging Plaintiffs' aftermarket definition is whether Plaintiffs have plausibly alleged that, when buying their iPhones, they did not *knowingly contract* to buy apps only from Apple for as long as they owned their iPhones, and did not *knowingly contract* to pay Apple a supracompetitive fee for every app they buy. The SAC more than

---

[6] Plaintiffs agree that it would best serve the interests of judicial economy for this Court to address these issues now.

plausibly alleges that Plaintiffs did not knowingly agree to do either of those things, *see* EOR 063, ¶ 3; EOR 066, ¶ 14; EOR 071, ¶ 44, and Apple does not contend otherwise with respect to the supracompetitive fee.

In *Newcal*, this Court sustained a complaint alleging that IKON, a copier manufacturer, foreclosed competition in two aftermarkets – one for "upgrade equipment" and another for "lease-end services" – by inducing customers to sign lease and service contract amendments that secretly extended the duration of the customers' original agreements. *Id.* at 1043-44. Each alleged aftermarket was found to be a "relevant market" in which IKON had market power. *Id.* at 1046.

Applying *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), this Court held that the inquiry for finding an antitrust aftermarket is whether: (i) "a consumer's selection of a particular brand in the competitive market is the ***functional equivalent of a contractual commitment*** giving that brand an agreed-upon right to monopolize its consumers in an aftermarket," and (ii) "consumers entered into such 'contracts' ***knowing*** that they were agreeing to such a commitment." *Newcal*, 513 F.3d at 1049 (emphasis added). Whether consumers entered into such a "knowing contractual (or quasi-contractual) arrangement" to buy aftermarket products only from the branded manufacturer, *id.*, is an inherently factual inquiry, like other "market definition" related inquiries, *id.* at 1045, 1051.

- 17 -

Discussing *Kodak*, this Court made clear in *Newcal* that "knowing consent" means that the consumers also must understand that they will be overpaying the monopolist in the aftermarket:

> Equally critically, the Supreme Court found that market imperfections, including information and switching costs, prevented consumers from discovering, as they were shopping for equipment, that the Kodak brand would include a *de facto* commitment to consume **only supracompetitively priced Kodak-brand service contracts**.

*Id.* at 1048 (citing *Kodak*, 504 U.S. at 473-78) (emphasis added).

In *Newcal*, the relevant inquiry was resolved in the plaintiff's favor based on four allegations, which also exist here. *First* is the existence of both a competitive "primary" product (the initial copier lease and service agreement) and a derivative "aftermarket" (for replacement parts and lease-end services) "in which the consumers claim that they should be able to shop for a secondary product." *Id.* at 1049. Here, the iPhone, which competes with other smartphones, is the primary product, and apps are the aftermarket in which Plaintiffs want the freedom to shop. As Judge Ware correctly held in *iPhone I*, iPhone apps are a "derivative" market because apps "would not exist without the market" for iPhones. *Id.*; *see iPhone I*,

596 F. Supp. 2d 1288, 1304 (N.D. Cal. 2008); EOR 064, ¶ 7; EOR 066, ¶ 14; EOR 068-071, ¶¶ 26-44.[7]

*Second*, the allegations of anticompetitive conduct must relate "only to the aftermarket," not to the primary market. *Newcal*, 513 F.3d at 1050. As Judge Ware also held in *iPhone I*, that is precisely what Plaintiffs allege here. *See iPhone I*, 596 F. Supp. 2d at 1304.

*Third*, the defendant's market power must be derived from its "relationship with" and "special access" to its consumers rather than from a contract with its consumers. *Newcal*, 513 F.3d at 1050. Here, Apple had no contract with iPhone purchasers giving Apple a monopoly for app sales or a right to reap supracompetitive profits from app sales. Instead, and again as Judge Ware held in *iPhone I*, Apple derived its aftermarket power solely from its relationship with and special access to iPhone customers, who were already invested in the expensive product by the time they bought their first app. *iPhone I*, 596 F. Supp. 2d at 1306.

*Fourth*, "market imperfections," or the defendant's "fraud and deceit" in failing to disclose their aftermarket monopoly, must "prevent consumers from realizing that their choice in the initial market will impact their freedom to shop in

---

[7] The requirement that the aftermarket be "derivative" addresses the type of anticompetitive harm that concerned the Supreme Court in *Kodak* – that suppliers of a primary product might exploit their "unique position" with their customers "to gain monopoly power in the derivative services market" when such power "was neither naturally nor contractually created." *Newcal*, 513 F.3d at 1049.

the aftermarket." *Newcal*, 513 F.3d at 1050.  Plaintiffs' similar allegations here,

EOR 075, ¶¶ 65-66, as in *Newcal*, rebut any "presumption that [iPhone] consumers

make a knowing choice to restrict their aftermarket options when they decide in the

initial (competitive) market" to buy an iPhone.  *Newcal*, 513 F.3d at 1050.

Plaintiffs, accordingly, have stated an aftermarket monopolization claim, as

Judge Ware correctly held in *iPhone I*:

> The allegations in the Complaint recite facts, which, if presumed
> to be true, would support the existence of an aftermarket for
> iPhone applications . . . .
>
> *        *        *
>
> Through the initial iPhone purchase and contracting, Apple is
> alleged to have gained the "special access" to consumers by
> which it is then able to lock consumers into use of only
> applications in which Apple maintained a financial interest. . . .
> Apple is then alleged to have enforced its special position
> through technological controls. . . . In sum, Plaintiffs have
> sufficiently alleged market power and monopolization in the
> iPhone [applications] aftermarket, which, taken with Plaintiffs'
> market allegations, is sufficient to state a claim for violation of §
> 2 of the Sherman Act.

*iPhone I*, 596 F. Supp. 2d at 1304, 1306 (citations omitted).

Apple's arguments to the contrary either misstate Plaintiffs' position or the

law.  Plaintiffs do not assert that an "aftermarket monopoly always exists unless the

plaintiff contractually consented" to the monopoly.  Def. Br. at 40.  Plaintiffs

readily acknowledge that consumers must "knowingly enter" into a contract *or* its

"functional equivalent" under *Newcal*, 513 F.3d at 1048, and Plaintiffs must still

prove that they are a relevant plaintiff class, *id.* at 1051. However, the SAC sufficiently pleads facts that will allow them to do so at trial.

Apple's main argument is that the "functional equivalent" of a contract to give Apple a monopoly exists as a matter of law because Apple believes consumers could "reasonably discover" Apple's monopoly. Def. Br. at 38-40, 42-45. But *Newcal*'s "knowing choice" standard, 513 F.3d at 1050, correctly imposes a higher burden on defendants than Apple's proposed "reasonably discoverable" standard.

Aftermarket monopolization claims deter defendants from exploiting consumers of their primary products by locking them unwittingly into a restricted aftermarket. *Kodak*, 504 U.S. at 476; *Newcal*, 513 F.3d at 1050. The "knowing choice" standard advances that objective because it encourages sellers to disclose monopolized aftermarkets at the point of sale, as cases Apple cites show. *See PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997) (rule that no *Kodak* claim lies where defendant has not changed policy "and the defendant has been otherwise forthcoming about its pricing structure . . . should encourage manufacturers to divulge all relevant information at the time of sale"); *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 763 (7th Cir. 1996) (if "Kodak had informed customers about its policies before they bought its machines, purchasers could have shopped around for competitive lifecycle prices"). Placing the burden on customers to "discover" the seller's monopoly would encourage

- 21 -

sellers *not* to disclose it and argue later, when sued, that the consumers should have figured it out, just as Apple argues here.

To this day Apple does not advertise or disclose its App Store monopoly to any of the millions of people who daily visit Apple's retail stores or shop on-line. It is only *after* purchasing an iPhone, and often well after, that customers learn that they can only buy apps from the App Store and not from anywhere else, even from the app developers themselves. By then, it is too late for them to make a "knowing choice" to accept the aftermarket monopoly that is foisted upon them, which they will be locked into due to the high switching costs of buying a new smartphone. Putting the onus on consumers to discover Apple's monopoly on their own would only enable Apple to continue its anticompetitive behavior.

Even if that burden were on consumers, those who bought iPhones before the App Store was announced in March 2008 could not reasonably have known about it, and only the miniscule percentage who may have read the press release Apple seeks improperly to submit with its Request for Judicial Notice could have learned that the App Store would be the exclusive source for apps. But even they could not have reasonably discovered that the apps would be supracompetitively priced. It is inconceivable that iPhone purchasers could have figured out that Apple was charging them 30% more than what the consumers would have paid if Apple had not monopolized the apps aftermarket.

What Plaintiffs reasonably could have discovered, in any event, is a factual issue that cannot be resolved on a motion to dismiss. *iPhone I*, 596 F. Supp. 2d at 1306. "Ultimately, what constitutes a relevant market is a factual determination for the jury." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1203 (9th Cir. 1997) (citation omitted). Because market definition and power need not "be pled with specificity" and "the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." *Newcal*, 513 F.3d at 1045 (citing *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) (market definition depends on "a factual inquiry into the 'commercial realities' faced by consumers")) (other citations omitted).

### B. Plaintiffs Adequately Allege Anticompetitive Conduct

Apple's argument that Plaintiffs have not alleged anticompetitive conduct is baseless. Plaintiffs have alleged that Apple engaged in exclusionary conduct by: (i) designing the iPhone to prevent its customers from downloading apps in which Apple has no financial stake; (ii) making the App Store the exclusive global distributor of iPhone apps; and (iii) enforcing its App Store monopoly through the coercive means of terminating apps developers who sell apps in competition with Apple and voiding the warranties of customers who buy competing apps. EOR 071, ¶ 43; EOR 076, ¶ 71.

Such exclusionary conduct that is designed to obtain or maintain a monopoly is a paradigm example of anticompetitive conduct the antitrust laws were enacted to eradicate. *See*, *e.g.*, *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998-99, 1000 (9th Cir. 2010); *Image Tech. Servs.*, 125 F.3d at 1208.

Plaintiffs have not merely alleged that Apple failed to "aid competitors" or to "'optimize' consumer welfare and competitive opportunities." Def. Br. at 46-47. Rather, Plaintiffs allege "'behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way,'" which constitutes anticompetitive conduct. *Free Freehand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1180 (N.D. Cal. 2012) (quoting *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008), and *Image Tech. Servs.*, 125 F.3d at 1208 (using monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor" is anticompetitive conduct)).

Apple's argument that Plaintiffs cannot plead anticompetitive conduct because the iPhone was an innovative product that produced some consumer benefits, Def. Br. at 48-49, is contrary to well-settled law. Product innovators and other natural monopolists that lawfully acquire a dominant share of one market cannot use their market advantage to leverage a monopoly position in another

economically distinct market or aftermarket. As this Court held in *Kodak* on remand, a monopolist cannot use "its monopoly in one market to monopolize or attempt to monopolize the downstream market." *Image Tech. Servs.*, 125 F.3d at 1209. Even a patent holder – the ultimate innovator and natural monopolist – cannot "extend a lawful monopoly beyond the grant of the patent" or engage in "exclusionary conduct that extends natural monopolies into separate markets." *Id.* at 1216 (citations omitted).

In *Kodak*, the Supreme Court reiterated that it has "held many times that power gained through some natural advantage . . . can give rise to liability if 'a seller exploits his dominant position in one market to expand his empire into the next.'" 504 U.S. at 479 n.29 (quoting *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 611 (1953)) (other citations omitted). *See also Mercoid Corp. v. Mid-Continent Inv. Co.*, 320 U.S. 661, 665 (1944) (the method used to unlawfully expand a monopoly "is immaterial").

This principle was emphasized in *Tyco*, where the Court held that product innovation can violate the antitrust laws if it is accompanied by exclusionary conduct aimed at preventing or eliminating competition. 592 F.3d at 998-99; *see id.* at 984, 1000, 1002.

In short, the law is clear that "patent … holders are [not] immune from antitrust liability," *Image Tech. Servs.*, 125 F.3d at 1215, companies that make

- 25 -

"changes in product design are not immune from antitrust scrutiny," *Tyco*, 592 F.3d at 998, and manufacturers with "inherent power" in one market are not "immunize[d] . . . from the antitrust laws in another market," *Kodak*, 504 U.S. at 479 n.29. Apple is not immune from antitrust liability for monopolizing the apps aftermarket simply because it invented a useful primary product (the iPhone).

Apple's argument that a firm that invents or improves a product has license to monopolize the aftermarkets for that product would mean that Microsoft could monopolize the PC software market every time it upgraded its Windows operating system. Microsoft, however, was found liable for antitrust violations when it tried to leverage its Windows monopoly into a dominant position in the derivative market for internet browsers, using some of the same means Apple has used here. *See United States v. Microsoft Corp.*, 253 F.3d 34, 59-63, 70-71, 73-75 (D.C. Cir. 2001) (Microsoft bound Explorer to Windows with "technological shackles"; it entered into restrictive licenses with computer manufacturers and exclusive contracts with internet access providers to make Explorer the default or sole browser; and it contracted with computer software developers to use only Microsoft's code).

Even if Apple offers a procompetitive purpose at trial for having monopolized the iPhone apps market, Apple will still be liable under Section 2 if Plaintiffs prove that Apple's stated purpose is pretextual or was achievable by less restrictive means. *See Image Tech. Servs.*, 125 F.3d at 1212.

## IV.   PLAINTIFFS ARE ENTITLED TO REPLEAD

Leave to amend is liberally granted in this Circuit, *Doe v. United States* (*In re Doe*), 58 F.3d 494, 497 (9th Cir. 1995), and should not be denied "unless . . . the pleading could not possibly be cured by the allegation of other facts," *Watison v. Carter*, 668 F.3d 1108, 1117 (9th Cir. 2012) (citation omitted).

On a record developed solely in support of direct purchaser standing, it was an abuse of discretion for the lower court to hold that Plaintiffs could not allege distinct facts that support standing under the indirect purchaser theory the lower court adopted.  *See Doe*, 58 F.3d at 497 (citing *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986) (where record contains no indication of, nor support for, determination that amendment is futile, district court erred by denying leave to amend)).  Plaintiffs consequently "should be afforded [the] opportunity" to develop facts supporting indirect purchaser standing in an amended complaint, in accordance with this Circuit's precedent liberally granting leave to amend.  *OSU Student Alliance v. Ray*, 699 F.3d 1053, 1079 (9th Cir. 2012).

Apple concedes that *Illinois Brick* is not a bar to injunctive relief, Def. Br. 51, but argues that remand should be denied because Plaintiffs failed to oppose Apple's motion to dismiss on this basis below.  Of course, it is Apple that failed to challenge Plaintiffs' standing to pursue injunctive relief below, so it was not incumbent on Plaintiffs to oppose a theoretical challenge that Apple failed to advance.

- 27 -

Apple's citation to *Allen v. Ornoski*, 435 F.3d 946, 960 (9th Cir. 2006), is misplaced.  The plaintiff there raised a new constitutional claim for the first time on appeal.  Plaintiffs, on the contrary, from the outset have requested a judgment enjoining Apple from monopolizing or attempting to monopolize the iPhone apps aftermarket in their Consolidated Complaint, EOR 146, Amended Consolidated Complaint, EOR 111, and SAC, EOR 78.  The lower court should not have dismissed a claim that Apple never once moved against in its four Rule 12 motions.

<u>CONCLUSION</u>

For the foregoing reasons, as well as those set forth in Plaintiffs' opening brief, Plaintiffs request this Court to reverse the District Court's August 15, 2013 and December 2, 2013 Orders and remand for further proceedings.

Dated:  August 25, 2014                    Respectfully Submitted,

                                              WOLF HALDENSTEIN ADLER
                                               FREEMAN & HERZ LLP
                                              MARK C. RIFKIN
                                              ALEXANDER H. SCHMIDT
                                              270 Madison Avenue
                                              New York, New York 10016
                                              Telephone: 212/545-4600
                                              Facsimile:  212/545-4677
                                              rifkin@whafh.com
                                              schmidt@whafh.com
                                              liskow@whafh.com

WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
FRANCIS M. GREGOREK
RACHELE R. RICKERT


By:      /s/ Rachele R. Rickert
          RACHELE R. RICKERT

750 B Street, Suite 2770
San Diego, California 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
gregorek@whafh.com
rickert@whafh.com

Attorneys for Plaintiffs-Appellants
*Robert Pepper, Stephen H. Schwartz,
Edward W. Hayter, and Eric Terrell*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,677 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in Times New Roman type style, 14-point font.

DATED:  August 25, 2014                    Respectfully Submitted,

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
MARK C. RIFKIN
ALEXANDER H. SCHMIDT
MICHAEL LISKOW
270 Madison Avenue
New York, New York 10016
Telephone: 212/545-4600
Facsimile:  212/545-4677
rifkin@whafh.com
schmidt@whafh.com
liskow@whafh.com

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
FRANCIS M. GREGOREK
RACHELE R. RICKERT

By:     /s/ Rachele R. Rickert
          RACHELE R. RICKERT

- 30 -

750 B Street, Suite 2770
San Diego, California 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
gregorek@whafh.com
rickert@whafh.com

Attorneys for Plaintiffs-Appellants
*Robert Pepper, Stephen H. Schwartz,*
*Edward W. Hayter, and Eric Terrell*